## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

M.D. Doe, by her Next Friend,
Father of M.D. Doe; C.W. Doe, by
his Next Friend, Mother of C.W.
Doe; and K.H. Doe, by her Next
Friend, Father of K.H. Doe,

Case No. 13-cv-11687

Judith E. Levy
United States District Judge

              Plaintiffs,

Mag. Judge Mona K. Majzoub

v.

Livonia Public Schools, Sharon
Turbiak, Nancy Respondek, Randy
Liepa, Candy Sokol, Cindy DeMan,
Shellie Moore, Beth Santer, Tracey
Crews, Maegan Sprow, Carol
DeBeaudry, Diane Sloboda,
Dorothy Chomicz, Meris Hoppe,
Lesley Hoskins, Kathy
Donagrandi, and Michael Fenchel,

              Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [244]

This case concerns the alleged abuse of three children with

disabilities by Livonia Public Schools' ("LPS") special education teacher

Sharon Turbiak. The children, M.D. Doe, C.W. Doe, and K.H. Doe, were

in LPS's Moderately Cognitively Impaired ("MoCI") afternoon program during the 2011-12 school year. Minor plaintiffs' parents as their next of friends allege that defendants violated the children's rights under the Fourteenth Amendment of the United States Constitution, the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and Michigan state law. Defendants jointly move to dismiss this case and, in the alternative, for summary judgment.

## I.    Background

This case was filed alongside two other cases alleging harms arising from a common set of facts: *Gohl v. Livonia Public Schools*, Case No. 12-cv-15199, and *Roeder v. Livonia Public Schools*, Case No. 13-cv-12012. Each case brought similar claims based on largely similar conduct by certain defendants. The primary distinction between each case is the specific conduct each student claims was directed at them by Sharon Turbiak, their special education teacher, and Nancy Respondek, a paraprofessional in Turbiak's classroom. For this reason, this case was consolidated with *Gohl* for discovery purposes. The record in *Gohl* as cited below, other than the allegation of specific conduct related to these plaintiffs, sets forth common, undisputed facts in this case.

In *Gohl v. Livonia Public Schools*, the district judge dismissed all federal claims and declined to exercise supplemental jurisdiction over the Michigan state law claims. 134 F. Supp. 3d 1066, 1069 (E.D. Mich. 2015). The United States Court of Appeals for the Sixth Circuit affirmed. *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672 (6th Cir. 2016). *Roeder* settled after *Gohl* was issued. *See* Case No. 13-cv-12012, Dkt. 255, Order Approving Plaintiff's Motion for Approval of Settlement (E.D. Mich. May 15, 2018).

Minor plaintiffs were preschool students in the MoCI program at Webster Elementary School, a grade school run by LPS, during the 2011-12 school year. (Dkt. 244-8 at 3-4.) M.D. has Down Syndrome (Dkt. 244-20 at 3-4), as does C.W. (Dkt. 244-21 at 4.) K.H. has Cri du Chat Syndrome. (Dkt. 244-22 at 3.) The MoCI program "[provides] educational and therapeutic services to Wayne County special-education students between preschool and age 26," *Gohl*, 134 F. Supp. 3d at 1069, and M.D., K.H., and C.W. all qualified for the program. Sharon Turbiak was plaintiffs' special education teacher (Dkt. 244-8 at 4), and Nancy Respondek, a paraprofessional, was an assistant in plaintiffs' classroom. (Dkt. 244-8 at 10; Dkt. 244-9 at 14.)

The 2011-2012 school year was turbulent for the MoCI program at Webster.

> During the school year, Turbiak faced several complaints about her teaching (and her relationship with her colleagues) . . . . In October 2011, a special-needs specialist [Beth Santer] approached the principal at Webster, Shellie Moore, and passed along some concerns from other staff members about Turbiak's classroom behavior. Moore looked into the issue and over the next few days catalogued concerns about Turbiak.

*Gohl*, 836 F.3d at 676-77. Moore investigated Santer's concerns by speaking with defendants Tracey Crews, Carol DeBeaudry, Candy Sokol, and Maegan Sprow. *Gohl*, 134 F. Supp. 3d at 1070. LPS employed Crews and DeBeaudry as occupational therapists, Sokol as a paraprofessional and Sprow as a speech therapist. (Dkt. 1 at 4.) Sokol staffed the MoCI preschool classroom with Respondek. (Dkt. 244-8 at 10.) DeBeaudry and Meris Hoppe, another speech pathologist, provided services to the morning session (Dkt. 244-12 at 3-4; Dkt. 244-13 at 3), and Crews and Sprow provided services to the afternoon session. (Dkt. 244-14 at 3; Dkt. 244 at 25.)

> According to Moore, an occupational therapist reported that Turbiak's class was "a very uncomfortable place to work" and that some on Turbiak's team thought she was overly "harsh with [the] children, holding their faces or chins tightly and

yelling in their faces." R. 184–9 at 2. A speech pathologist thought that Turbiak "used too much force by pushing on children's shoulders," and that the "lower functioning children in the classroom were frustrating to Ms. Turbiak and . . . were most vulnerable to possible rough treatment." *Id.* A paraprofessional called Moore in tears, worrying that Turbiak's bad behavior was "escalating." *Id.* An occupational therapist said that Turbiak was "gruff and abrupt"; that Turbiak once force-fed a gagging and crying student; and that Turbiak "picked up [children] from the floor by one arm and that there was the potential to dislocate a small shoulder." *Id.* . . .

On the advice of Cynthia DeMan, the Director of Personnel for Livonia Public Schools, Moore met with Turbiak to discuss her teaching. During the meeting, Turbiak admitted that she was "feeling unappreciated at Webster" and that she was "stressed out because of the level of disability of her students and the reduction of support." *Id.* at 3. Turbiak also explained that she was not as "touchy feely" as her co-workers, had high expectations for her students, and "wanted them to make gains while in her classroom." *Id.* The next morning, even though Moore told Turbiak not to question the members of her team, Turbiak called a meeting to find out who had complained to the administration. This did not help matters. Members of Turbiak's team went to Moore again, telling her about the meeting and adding that they feared retaliation.

*Gohl*, 836 F.3d at 677 (alterations in original). This prompted Moore to contact DeMan, who told Moore to instruct Turbiak to report to the LPS central office. (Dkt. 244 at 34.) Moore also sent over her catalogue of staff

concerns regarding interactions with Turbiak (the "Moore timeline"). (Dkt. 244 at 34; Dkt. 252 at 32-33.)

On November 2, 2011, Turbiak and her union representative met with DeMan, Dorothy Chomicz, co-director of human resources, Michael Fenchel, the other co-director of human resources, and Kathy Donagrandi, the administrator of student services. (Dkt. 244-6 at 9, 12-13-16; Dkt. 244-17.)

> The meeting focused on Turbiak's strained relations with her colleagues rather than on mistreatment of students. DeMan sent Turbiak home for a few days and followed up with a consultation letter, which explained, at heart, that, if Turbiak was not more professional with staff and students, she would be subject to disciplinary action. The letter urged Turbiak to follow "best practices" and to avoid "laps[ing] into inappropriate behaviors with either staff or students." R. 123–8 at 2. But the letter did not specifically accuse Turbiak of abusing students.
>
> The meeting helped. For four months, no one reported any mistreatment of students by Turbiak or complained about friction between her and other employees.
>
> The peace ended on March 5, 2012, when a social worker, Diane Sloboda, saw Turbiak "grab [J.G.] by the top of his head and jerk it back quite aggressively. She also yelled 'You need to listen' very close to his face." R. 123–9 at 2. Sloboda told Principal Moore about the incident. Moore called the central office and was instructed to send Turbiak over that afternoon.

Turbiak and her union representative met with DeMan and Dorothy Chomicz, a director of human resources. Turbiak denied any "grab[bing]" or "yell[ing]." R. 179–6 at 21. She said she was using a special education technique called "redirecting" to focus and hold J.G.'s attention after he threw a ring-stacking toy. *Id.* Consistent with this technique, she said she put her hand on the back of J.G.'s head "to keep [it] from bouncing around,"—a problem for J.G.—and "[s]poke directly" to him. R. 179–6 at 21. Chomicz, trained as a special education teacher and familiar with this technique, thought this sounded reasonable and sent Turbiak back to her classroom.

Later in March, one of Turbiak's paraprofessionals, Nancy Respondek, was accused of spanking a student (not J.G.), after which the school investigated the incident and whether Turbiak was behaving "in accordance with [the] guidelines" set forth in DeMan's November consultation letter. R. 123–12 at 2. After the investigation, the district placed Turbiak and Respondek on administrative leave.

*Gohl*, 836 F.3d at 677-78 (alterations in original). A few months later, LPS offered Turbiak, who had tenure, the option of resigning or being terminated (Dkt. 252-24 at 3-4), terminated Respondek (Dkt. 252-25 at 2), suspended Crews, DeMan (Dkt. 252-26 at 2), and issued discipline letters to DeBeaudry, Sloboda, and Sprow. (Dkt. 252-27.) During this period, Randy Liepa was the superintendent of LPS. (Dkt. 1 at 34.)

Plaintiffs' claims stem from the following conduct that they allege Turbiak and Respondek engaged in:

1) In January 2012, Turbiak yelled at K.H. to sit down in her chair. When K.H. would not sit down, but stood facing the chair with her hands on the arms of the chair and her knees locked, Turbiak pulled the chair out from under K.H. so that K.H. would fall down. (Dkt. 252 at 43.)

2) In March 2012, Turbiak moved a chair out from underneath M.D. with her foot when M.D. "was backing into" the chair, and M.D. fell to the floor. (*Id.*)

3) In March 2012, Turbiak and Respondek prevented K.H., who has auditory sensitivity, from covering her ears and would laugh at her when she did. (*Id.* at 43-44.)

4) Over the course of the school year, Turbiak yelled at K.H., and at least once put K.H. in an unsafe situation where K.H. could not move or else she could fall. She also sang "Twinkle Twinkle Little Star" knowing the song upset K.H. and then put a modified potato chip can on K.H.'s arms to restrain K.H. from covering her ears or face. (*Id.* at 44-45.)

Plaintiffs do not allege that Turbiak or Respondek engaged in any specific abusive action toward C.W. other than the general allegation of creating an abusive environment. (*See* Dkt. 252 at 43-45.)

At some point in 2012 and 2013, Crews, DeBeaudry, and Sloboda entered into arbitration against LPS regarding their written reprimands, as well as Sloboda's suspension. (Dkts. 252-28 to 252-31, 252-38 to 252-40.) The reprimands regarded the failure of each individual to "report in a timely manner suspected child abuse and/or neglect to [their] supervisor (principal) that occurred in the pre-school, special education classroom of a teacher at the school" in relation to Turbiak and Respondek's classroom. (Dkt. 252-27 at 4, 5, 6.) On August 6, 2013, the arbitrator issued awards determining that these employees were obligated to report suspected child abuse, but reducing Crews' and DeBeaudry's discipline to a verbal warning while upholding Sloboda's suspension. (Dkts. 252-38 to 252-40.)

On April 4, 2013, plaintiffs filed this lawsuit, alleging violations of the Fourteenth Amendment of the United States Constitution, the ADA, the RA, and Michigan state law, including assault, battery, intentional infliction of emotional distress ("IIED"), and failure to report child abuse.

Plaintiffs originally filed eighty-five claims against seventeen defendants, but plaintiffs have stipulated to dismiss many claims, including all claims against Lesley Hoskins; all claims under Michigan's Elliot-Larsen Civil Rights Act; all ADA and RA claims against individual defendants; all claims alleging the denial of a free, appropriate public education under 42 U.S.C. § 1983; all federal claims by C.W. Doe; and intentional infliction of emotional distress against LPS. (Dkt. 263.) These claims remain: § 1983 claims against all remaining defendants (counts 1-12 and 14-17); ADA and RA claims against LPS (counts 34 and 51); failure to report child abuse under state law against all remaining defendants (counts 54 through 64); assault and battery under state law against Turbiak and Respondek (counts 65 through 68); and intentional infliction of emotional distress under state law against all remaining defendants except LPS (counts 69 through 84). (Dkt. 1, Dkt. 263.)

*Hall Report*

As an initial matter, plaintiffs rely heavily on a report prepared by Sharon Hall, their proposed expert. Hall based her report entirely on an investigatory report by LPS, entitled "the Schultz Report," which this Court found inadmissible as hearsay. (Dkt. 277 at 29:3-4.) Hall never

personally spoke with students or their parents. She also did not individually assess plaintiffs before reaching her findings that the students were denied an educational benefit. (Dkt. 244-41 at 3; Dkt. 252-32 at 35-36.) Hall did not examine Turbiak's conduct toward each plaintiff. (Dkt. 252-32 at 14-30.) And she did not attempt to determine the effect Turbiak's conduct actually had on plaintiffs; she hypothesized about what effect her conduct would have on students in general. (*Id.* at 30-31.) It is particularly problematic that Hall never identified individual students in her analysis, either by name or by incident—she only lists students and events in general tables. (Dkt. 252-32.)

Halls' report does not support plaintiffs' claims because it is broad, conclusory, and speculative. Halls' report only draws sweeping, global conclusions about Turbiak's "behavior" and the "climate" in her classroom. (Dkt. 252-31 at 13.) The ADA, the RA, and § 1983 claims all require an individualized inquiry, *see infra* Section III.C, III.D. The report is conclusory, in a general analytical sense, and because it reaches legal conclusions. In one section, Hall concludes, "[i]t is unreasonable to believe that students were receiving" an educational benefit, yet she never considered plaintiffs' individual education plans in her analysis.

(Dkt. 252-32 at 46-47.) Finally, the report is speculative. For example, in her discussion of whether the students were affected by Turbiak's behavior, Hall only says "a child . . . may" or "the children may"—there is no actual finding for any student. (*Id.* at 30.)

## II.    Legal Standard

Defendants filed their motion as one to dismiss and, in the alternative, for summary judgment. Because defendants attached multiple exhibits that the Court has considered, the motion will be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d).

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court may not grant summary judgment if "the evidence is such that a reasonable juror could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts "view[ ] the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

A defendant "seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then, "the nonmoving [plaintiff] must present sufficient evidence to create a genuine issue of material fact." *Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir.2004) (citing *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)). *See also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials.").

## III. Analysis

### A. Abandoned Claims

Defendants assert that several claims have been abandoned. Of the claims left after the Order to Dismiss Certain Claims (Dkt. 263), defendants argue that plaintiffs failed to respond to the ADA and RA claims against LPS; Fourth Amendment claims under § 1983; assault and battery claims against Respondek; and intentional infliction of emotional distress claims against all individual defendants. Plaintiffs

have abandoned some claims, and others were not raised in the complaint.

Plaintiffs abandoned certain claims against Respondek. A plaintiff abandons a claim "when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing cases). Here, plaintiffs failed to respond to the assault and battery claims against Respondek. (Dkt. 252 at 160-62.) Plaintiffs also only discuss Respondek's liability under the Fourteenth Amendment with all other individual defendants, never as an abuser or discriminator herself. (*Id.* at 102-117.) Therefore, those claims are abandoned.

However, plaintiffs did not abandon their ADA, RA, and IIED claims. Plaintiffs mention the ADA and RA in the header of their response, though they only discuss the ADA in their analysis. (*Id.* at 72-85.) This is sufficient because the analyses are the same for both claims. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008). Plaintiffs also responded to the IIED claims, albeit briefly. (Dkt. 252 at 163.)

Finally, Plaintiffs failed to plead a Fourth Amendment claim in the first place and did not seek to amend their pleadings, so it cannot be raised or furthered at this stage of the litigation.

### B. Estoppel Claims

Both parties raise estoppel arguments that fail. Plaintiffs argue the arbitration proceedings with Crews, DeBeaudry, and Sloboda judicially and collaterally estop each of these defendants from denying that Turbiak abused children. Defendants argue that the *Gohl* opinions collaterally estop plaintiffs from relitigating these issues of fact: "whether LPS administrators responded to concerns about Turbiak in October 2011 and the adequacy of the . . . response" (Dkt. 244 at 39-40); "no incidents were reported between November 2011 and March 2012" (Dkt. 244 at 45-46); "Hall's report fails to provide evidence of a denial of educational benefits" (Dkt. 244 at 51); and the record "does not support a finding that LPS acted, or failed to act, based on the minor plaintiffs' disabilities." (Dkt. 244 at 53.) Estoppel does not apply to this case.

Defendants are not judicially estopped by the arbitration in this case. Judicial estoppel prevents "a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior

proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)). At a minimum, "a party's later position must be 'clearly inconsistent' with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting cases). Plaintiffs do not cite, and no portion of the arbitration record provided sets forth, any evidence that the arbitration specifically addressed whether Turbiak abused these minor children. Further, LPS's position in the arbitration is consistent with its position now: abuse was suspected, not that it actually occurred. (Dkt. 256 at 27; Dkt. 252-31.) LPS has not contradicted that position in this case. Therefore, LPS is not judicially estopped from pursuing any position it has taken.

Defendants are also not collaterally estopped in this case by the arbitration. Federal courts generally accord preclusive effect to issues decided by state courts or arbitration panels. *Allen v. McCurry*, 449 U.S. 90, 95 (1980); 28 U.S.C. § 1738. In Michigan, collateral estoppel requires:

> (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full [and fair] opportunity to litigate the issue; and (3) there must be

mutuality of estoppel. Mutuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action. In other words, the estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him.

*Monat v. State Farm Ins. Co.*, 469 Mich. 679, 683-85 (2004) (internal citations and quotations omitted). No plaintiffs were party to or in privy with any of the parties to the arbitration nor do plaintiffs show how they could be. (Dkt. 252 at 66-67.) Accordingly, plaintiffs do not satisfy the mutuality requirement, and the arbitration does not collaterally estop any position of LPS, Crews, DeBeaudry, or Slobodan.

The factual findings in the Sixth Circuit *Gohl* opinion also do not collaterally estop plaintiffs in this case. When a federal court must determine the preclusive effect of a prior federal judgment, it applies federal law. *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 324 n.12 (1971); *Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005). In the Sixth Circuit, collateral estoppel requires:

(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the

party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*NAACP, Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir. 1987).

Defendants do not claim that plaintiffs have had a full and fair opportunity to litigate the facts defendants point to, most likely because plaintiffs have not. This is the first time M.D, K.H., and C.W. have pressed their unique claims against defendants. *Gohl* only determined whether defendants' conduct toward plaintiff J.G. amounted to a violation of his rights under the Constitution, federal statutory law, or state law.

Instead, defendants incorrectly focus on the privity requirements of Michigan law, but even then they do not show that these plaintiffs were in privity with the *Gohl* plaintiff. The only authorities defendants cite are inapplicable here because they address whether plaintiffs can have their interests represented by classes of plaintiffs by sharing the same "community of interests," *see Detroit Police Officers Ass'n v. Young*, 824 F.2d 512, 516 (6th Cir. 1987); *Guyton v. Detroit Public Schools*, No. 08-10104, 2008 WL 2064562 at *4-5 (E.D. Mich. May 14, 2008); or whether

a principal-agent relationship establishes privity. *ABS Industries, Inc. ex rel. ABS Litigation Trust v. Fifth Third Bank*, 333 F. App'x 994, 999 (6th Cir. 2009). But this case does not present a question of whether plaintiffs can be said to have had their interests represented in a prior class action because there was only a single minor plaintiff in *Gohl*. There is also no principal-agent relationship at stake here. Thus, plaintiffs are not collaterally estopped from litigating their claims in this case.

### C. Constitutional Claims

Plaintiffs allege under 42 U.S.C. § 1983 that defendants violated their rights under the Fourteenth Amendment, specifically that defendants violated their right to personal security and bodily integrity in violation of the Due Process Clause and discriminated against them based on their disabilities in violation of the Equal Protection Clause. To succeed under § 1983, plaintiffs must show a "violation of a right secured by the Constitution and laws of the United States, and must show that the alleged violation was committed by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Defendants are entitled to summary judgment because plaintiffs have not pointed to evidence

from which a reasonable juror could find that a constitutional injury occurred under either the Due Process or Equal Protection Clause.

1. Fourteenth Amendment: Substantive Due Process

The Due Process Clause of the Fourteenth Amendment protects individuals from state actions that deprive the individual "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "It is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury." *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996) (quoting *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 19877)). Substantive due process "protects individuals from the arbitrary actions of government employees, but 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *Gohl*, 836 F.3d at 678 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). The question is always whether the executive official's conduct "shocks the conscience." *See, e.g.*, *Webb*, 828 F.2d at 1158.

Plaintiffs appear to present three theories of constitutional injury under the Fourteenth Amendment. First, that defendants demonstrated "deliberate indifference to the health and safety of Plaintiffs," violating

plaintiffs' substantive due process rights to bodily integrity"—Turbiak through the alleged "physical and emotional abuse" of students and all other defendants through their inaction, despite knowledge of Turbiak's conduct. (Dkt. 252 at 91-93.) Second, that individual defendants other than Turbiak contributed to a "state-created danger." (Dkt. 252 at 94.) And third, that under the malicious and sadistic standard, all individual defendants violated plaintiffs' bodily integrity. (Dkt. 252 at 102-17.)

### i. *Deliberate Indifference to Health and Safety, and State-Created Danger*

First, plaintiffs' theory that defendants' conduct gives rise to a constitutional violation under the deliberate indifference standard fails because plaintiffs offer no authority that permits this Court to apply that standard in this case.[1] "Deliberate indifference" is easier to show than "malicious indifference" when evaluating whether conduct shocks the conscience. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (describing the conduct that shocks the conscience under deliberate indifference as "less egregious"). However, plaintiffs only point to cases

---

[1] Plaintiffs did not plead this claim against Respondek, and they have not sought to amend their pleadings.

dealing with basic medical needs of prisoners, *Lewis*, 523 U.S. at 850 (citing *Barrie v. Grand Cty.*, 119 F.3d 862, 867 (10th Cir.1997); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)); police standoffs, *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002); or other police custodial situations, *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003). The only case in the Sixth Circuit this Court could find applying deliberate indifference in a school environment was *McQueen v. Beecher Community Schools*, which is qualitatively different from this case. 433 F.3d 460, 462, 469-70 (6th Cir. 2006) (holding a teacher was not deliberately indifferent when she left students unattended in classroom with another student who pulled out a gun and shot a student).

Furthermore, recent Sixth Circuit case law applies a three factor test to determine if the deliberate indifference standard is appropriate.[2] *Eg. Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014) (applying *Hunt v. Sycamore Community Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th

---

[2] Deliberate indifference is also an element of municipal liability theories, specifically as "a dereliction as reflective of municipal policy" and failure to train an employee *Lewis*, 523 U.S. at 850 n.10 (citing *Canton v. Harris*, 489 U.S. 378, 388-89 (1989)). *See also Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (failure to train or supervise); *Claiborne Cty.*, 103 F.3d at 508 ("inaction" theory municipal liability). As stated above, plaintiffs did not plead a failure to train. Thus, that argument cannot be furthered.

Cir. 2008)); *Hunt*, 542 F.3d at 535 (examining "(1) the voluntariness of the relationship between the government and the plaintiffs . . . ; (2) whether the executive actor was required to act in haste or had time for deliberation; and (3) whether the government actor was pursuing a legitimate governmental purpose"). Plaintiffs have not addressed this three factor test in their argument that deliberate indifference is the appropriate standard.

Second, plaintiffs' state-created danger theory fails as a matter of law. In the Sixth Circuit, the state-created danger test applies when the actions of private third parties harm the plaintiffs. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *In re Flint Water Cases*, No. 16-cv-10444, 2018 WL 3648044, at *12 (E.D. Mich. Aug. 1, 2018) (citing *Kallstrom*, 136 F.3d at 1066). All of the cases plaintiffs point to deal with injuries caused by private third parties, usually students, including the case plaintiffs cite to establish the requirements of the state-created danger theory. *See, e.g., Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 853 (6th Cir. 2016) (identifying student-on-student harassment as the risk to plaintiffs from defendants' conduct); *C.R. v. Novi Cmty. Sch. Dist.,* No. 14-14531, 2017 WL 528264, at *12 (E.D. Mich.

Feb. 9, 2017) (same). Plaintiffs admit that there is no factual dispute whether defendants were acting under color of state law (Dkt. 252 at 86 n.13), so defendants cannot be the private third parties who caused the alleged harm. Therefore, defendants are entitled to summary judgment on this claim as a matter of law.

### ii. Malicious and Sadistic Standard

Under the malicious and sadistic standard, plaintiffs allege that defendants violated plaintiffs' substantive due process rights to be free from physical abuse from state actors and to enjoy personal security and bodily integrity in an educational setting. Plaintiffs argue that Turbiak violated this right and that all other defendants are liable for failure to intervene and stop Turbiak's conduct. (Dkt. 252 at 109, 132.) Plaintiffs appear to be suing all individual defendants in their personal capacities and LPS as a municipality.

Where plaintiffs allege their rights to personal security and bodily integrity were violated in a school setting, the Court must determine whether there is a pedagogical justification for the force. *See Domingo v. Kowalski*, 810 F.3d 403, 410-11 (6th Cir. 2016). If there is a pedagogical justification, a four factor test from *Gottlieb v. Laurel Highlands School*

*District* applies. *Id.* at 411 (quoting *Gottlieb*, 272 F.3d 168, 173 (3d Cir. 2001)). When there is not a pedagogical purpose, courts only make a general inquiry whether the conduct was malicious and sadistic such that it shocks the conscience. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996) (alteration in original) (quoting *Webb*, 828 F.2d at 1158).

Each of these tests focuses on the force applied, *see Domingo*, 810 F.3d at 411; *Lillard*, 76 F.3d at 725, and so only Turbiak's conduct must be analyzed—she is the sole defendant who applied force to plaintiffs. Therefore, absent a theory of supervisory or municipal liability, plaintiffs' claims based on the malicious and sadistic standard must be dismissed as to every individual defendant other than Turbiak because none of them are accused of applying force to any plaintiff.

There are four instances of force by Turbiak against K.H. and M.D.: 1) pulling the chair out from under K.H., 2) moving a chair out from under M.D., 3) preventing K.H. from covering her ears and laughing at her when she became upset that Turbiak had yelled in her face, and 4) putting a modified potato chip can on K.H.'s arms to prevent K.H. from covering her ears or face. It is clear from the record that Turbiak engaged

in conduct that was inappropriate and that she was emotionally and professionally ill-equipped to deal with her students with significant disabilities. But as set forth below, these four events do not rise to the level of a violation of plaintiffs' substantive due process rights. The first, third, and fourth instances related to K.H. are evaluated together under *Gottlieb* because defendants offer a pedagogical purpose, and the allegations related to the M.D. are evaluated under *Lillard* because they lacked a pedagogical purpose.

### a. Incidents with a Pedagogical Purpose

The Sixth Circuit has adopted the following test to determine whether force shocks the conscience when applied for a pedagogical purpose:

> a) Was there was a pedagogical justification for the use of the force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c) Was the force applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there was a serious injury?

*Domingo*, 810 F.3d at 411 (quoting *Gottlieb*, 272 F.3d at 173). Turbiak offered a pedagogical justification for the force Turbiak used involving K.H., and so the *Gottlieb* four factor test as laid out in *Domingo* applies.

Furthermore, each of the four factors indicate that there was no substantive due process violation.

"[T]he pedagogical purpose factor of the *Gottlieb* test first looks to the ends motivating the teacher's actions and not the means undertaken to achieve those ends." *Id*. at 412. "Abuse alone . . . is not the standard at issue on [these kinds] of due process claims." *Id*. at 411. In *Domingo*, strapping a student with disabilities to a toilet and squeezing children's faces were "questionable" "educational and disciplinary techniques," but did not lack a legitimate pedagogical purpose because the techniques were more closely related to the pedagogical purposes of toilet-training and attention-focusing techniques than to abuse. *Id*. at 412-13.

Though Turbiak's techniques were certainly questionable, her purposes were more pedagogical than abusive. Defendants offer the following pedagogical purposes: Turbiak moved the chair to help K.H. learn how to transition to a chair when she stood facing the chair with her hands on the chair arms and her knees locked. (*E.g.* Dkt. 244-8 at 17.) Second, Turbiak prevented K.H. from covering her ears so that she could demonstrate K.H.'s "sensitivity to sound" to other staff (Dkt. 244-13 at 143-44; Dkt. 244-14 at 192-93) and to ensure K.H. could participate

in classroom activities, rather than covering her ears and face.[3] (Dkt. 244-42 at 2.) And third, Turbiak used the potato chip can restraint to help K.H. perform functional activities (Dkt. 244-14 at 18) by preventing K.H. from shutting down by covering her ears. (Dkt. 244-8.) These purposes are similar to those in *Domingo*, and are therefore more pedagogical than abusive, even if the techniques used to achieve them are problematic.

Plaintiffs argue that these pedagogical reasons are unacceptable, but they do not cite any material showing that these proffered purposes are illegitimate. Plaintiffs cite to Hall's report, which broadly states that Turbiak was abusive and her behavior could not be categorized as pedagogical. (Dkt. 252 at 110-11.) However, plaintiffs ignore the issue highlighted in *Domingo*—that the teacher's motivations are the issue, not whether the conduct was abusive. Here, neither Hall's report nor plaintiffs' flat assertions of abuse go to Turbiak's motivations. Other than asserting that Turbiak engaged in a pattern of abusive conduct (Dkt. 276 at 4), plaintiffs offer no evidence negating the validity of Turbiak's purported pedagogical intent. Furthermore, Hall makes broad

---

[3] Plaintiffs only allege that Turbiak prevented K.H. from covering her ears (Dkt. 252 at 109), though their memorandum of law states Respondek did as well. (Dkt. 252 at 43-44).

conclusions and nothing in the report indicates that she analyzed this specific instance of conduct—moving K.H.'s chair—to reach her conclusions. (*Id.*) Plaintiffs also assert that defendants did not provide a pedagogical purpose until litigation had begun (Dkt. 276 at 5), but they provide no authority for why the timing of the offered purpose negates the pedagogical purpose.

Plaintiffs also rely on *Alexander v. Lawrence County Board of Developmental Disabilities*, No. 1:10-cv-697, 2012 WL 831769 (S.D. Ohio March 12, 2012), to show that physical restraints on students with disabilities have no pedagogical purpose, but plaintiffs overstate *Alexander*'s holding. There, a student with special needs was subject to "prone restraints," meaning teachers held the student in a face-down position, and in one instance the plaintiff was held face-down by five adults sitting on him. *Alexander*, 2012 WL 831769, at *2 & n.3. These techniques were not only improper, but clearly dangerous and possibly life-threatening. *See id.* at *5 & n.7 (citing *Lanman v. Hinson*, 529 F.3d 673, 687 (6th Cir. 2008)). Nothing in the record suggests that the potato chip can restraint used on K.H. was as dangerous and inappropriate as prone restraints. In fact, defendants provide a professional newsletter

that recommended the restraint. (Dkt. 244-11 at 145-46.) Furthermore, *Alexander* was a case where no pedagogical purpose for the force used was offered, *see* 2012 WL 831769, at \*5, and in this case a pedagogical purpose was offered.

Second, plaintiffs fail to make an affirmative showing that when Turbiak moved K.H.'s chair, prevented K.H. from covering her ears, or used the potato chip can restraint on K.H., her conduct was excessive or extreme in light of the stated pedagogical goals. Plaintiffs lump all of these instances of Turbiak's conduct together and argue that the "catalogue of cruelty by Turbiak" shows her behavior was extreme. (Dkt. 252 at 109.) However, plaintiffs cite no authority supporting their claim that witnessing a pattern of abuse of other students could constitute a violation of the Due Process Clause. (*See* Dkt. 252 at 87; Dkt. 276 at 4.) In the Sixth Circuit, the rule is the opposite: "to establish liability [under § 1983] and overcome a qualified immunity defense, an individual must show that his or her own rights were violated, and that the violation was committed personally by the defendant." *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (emphasis omitted). *See also Webb v. United States*, 789 F.3d 647, 664 (6th Cir. 2015) ("While [defendants] may have

violated the clearly established constitutional rights of *some . . .* [plaintiff] does not show they violated *his* clearly established rights.") (emphasis in original)).[4]

Furthermore, the *Gottlieb* test also asks "[w]as the force utilized excessive to meet the legitimate objective *in this situation*?" *Domingo*, 810 F.3d at 411 (emphasis added) (quoting *Gottlieb*, 272 F.3d at 173). Plaintiffs present no authority, and this Court is not aware of any, that permits them to aggregate the behavior of Turbiak in applying the *Gottlieb* test, particularly as to the "excessiveness" factor.

Even looking at the incidents separately under prevailing law in this Circuit, plaintiffs have not shown that there was excessive force. Squeezing students' faces and pushing students' heads down was not "clearly disproportionate to the need presented" because it was "minimal, and therefore not excessive." 810 F.3d at 414. Force that leaves bruises and swelling on a student was not excessive in that instance. *Saylor v. Bd. of Educ. of Harlan Cty.*, 118 F.3d 507, 511 (6th Cir. 1997). "Even in a

---

[4] The only way plaintiffs can show there is a pattern of conduct amounting to a constitutional violation due to a municipal officer's deliberate indifference would be a *Monell* claim under a "failure-to-train" theory. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Plaintiffs did not plead this, nor have they sought to amend their pleadings. Therefore, it is not considered on this motion.

case where a teacher slapped a student with no pedagogical purpose whatsoever, [the Sixth Circuit] held that the single slap was not unconstitutionally excessive, because it 'was neither severe in force nor administered repeatedly'." *Domingo*, 810 F.3d at 414 (quoting *Lillard*, 76 F.3d at 726). *Cf. Gohl*, 836 F.3d at 679 (finding there was a question whether the force Turbiak utilized was excessive when she grabbed a child's head and pulled it back, but still granting defendants' motion for summary judgment).

There is no evidence in the record suggesting that Turbiak used excessive force in either of these instances. Regarding the chair incident, Turbiak stated that she moved the chair out of the way so K.H. would have room to work on learning to transition to the floor. (Dkt. 244-8 at 17.) Crews, an occupational therapist, testified that she told Turbiak to help K.H. get into a position so that K.H. could sit down, which she could not do on her own since her knees were locked. (Dkt. 244-14 at 4.) Likewise, Sprow testified that Turbiak "wiggled" the chair but "[i]t wasn't in a forceful way." (Dkt. 244-15 at 13.) And when Turbiak prevented K.H. from covering her ears, Turbiak always stopped pushing on K.H.'s arms if she resisted. (Dkt. 244-14 at 17-18.) There is likewise no indication that

Turbiak inappropriately used the potato chip can restraint. Although plaintiffs characterize the incidents as abusive, they fail to raise a question of fact that would permit a reasonable juror to reach this conclusion.

Viewing the record in the light most favorable to plaintiffs, they have failed to raise a material question of fact regarding whether the force used was excessive. Turbiak moved a chair to help K.H. transition and ultimately let her fall several inches onto a padded floor, and she pushed and pulled on K.H.'s arms and utilized a restraint to ensure K.H. could participate in the classroom and receive appropriate therapies. Though there are undoubtedly better ways to accomplish these goals, these instances do not rise to the level of force that leaves bruises, delivers a slap, or yanks a child's head backwards.

Third, there is no material factual dispute whether Turbiak was malicious when she moved K.H.'s chair. Plaintiffs appear to assert that Turbiak was malicious by pointing to Hall's report, which broadly concluded Turbiak was abusive. (Dkt. 252 at 111.) As with the first factor, the third factor goes to the intent of the educator. *Domingo*, 810 F.3d at 414. Again, Hall's report is insufficient to raise a material question of fact

because it only makes general conclusions that Turbiak was abusive and does not assess any single incident, including those where Turbiak moved K.H.'s chair, prevented K.H. from covering her ears, and used the potato chip can restraint on K.H. Although plaintiffs point to inappropriate comments by Turbiak, such as saying she had a "sick sense of humor" when M.D. fell (Dkt. 252 at 43), these comments were not made with regard to K.H. and therefore do not address Turbiak's intent during this incident with K.H.

Fourth, it is undisputed that K.H. was uninjured. The record clearly states K.H. was uninjured physically when Turbiak moved the chair. (Dkt. 244-14 at 4; Dkt. 244-15 at 13.) In her timeline, Moore referenced a discussion with a physical therapist where the physical therapist said it would not be injurious to plaintiffs to fall on the preschool's padded floor on their diapered bottoms.[5] (Dkt. 252-7 at 2 ("[L]etting them fall in the [classroom] would be appropriate as the floor *is* deeply padded.") (emphasis added).) Furthermore, Sprow testified that K.H. "didn't cry"

---

[5] In their response, plaintiffs seem to suggest that the floor was unpadded, and thus it was inappropriate for Turbiak to allow children to fall onto their diapered bottoms in the MoCI classroom by selectively quoting from Moore's Timeline. (Dkt. 252 at 29 n.3.) The record unequivocally states that the children in Turbiak's classroom only fell to padded floors.

and "didn't seem phased by [the fall to the ground]." (Dkt. 244-14 at 4.) Additionally, the record shows Turbiak always stopped when K.H. resisted. (Dkt. 244-14 at 17-18.)

Plaintiffs also fail to show that K.H. actually suffered a psychological injury. Plaintiffs generally point to Dr. Gerald Shiener's Report (Dkt. 252 at 114), but at no time did Shiener claim K.H., or any particular plaintiff, was actually injured and experienced "lasting brain changes" or inhibited "brain development" from witnessing the abuse of other children.[6] (*See* Dkt. 252-35 at 5, 12, 18.) *See also Gohl*, 134 F. Supp. 3d at 1097. Plaintiffs also point to Hall's report, but Hall only speculates about whether plaintiffs were affected by Turbiak's behavior, and she does not conclude they were injured by it. (Dkt. 252 at 162.) Substantively, plaintiffs would need to provide evidence showing K.H. actually suffered a psychological injury, such as by procuring an individual evaluation by a child psychologist.

---

[6] This Court initially excluded Shiener's reports because they did not comply with Fed. R. Civ. P. 26(a)(2)(B) (Dkt. 268 at 4-5), but they were later admitted upon plaintiffs' motion for reconsideration. (Dkt. 272; Dkt. 277 at 11-12.)

Plaintiffs have not presented sufficient evidence so that a reasonable juror could find K.H.'s due process rights were violated by defendants when Turbiak moved K.H.'s chair, prevented K.H. from covering her ears, or placed a potato chip can restraint on K.H.'s arm.

### b. Incidents without a Pedagogical Purpose

In the absence of a pedagogical purpose,

> the . . . inquiry . . . must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Lillard*, 76 F.3d at 725 (alteration in original) (quoting *Webb*, 828 F.2d at 1158). Generally, accidents may lead to a negligence claim, not a violation of constitutional law. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process . . . [i]t is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim." *Lewis*, 523 U.S. at 849 (citations omitted); *Claiborne Cty.*, 103 F.3d at 511 ("The Due Process Clause does not purport to supplant traditional tort law . . . it remains clear that not every tort rises to the level of a

constitutional violation." (quotations omitted)). Unlike the other three instances of conduct, defendant does not offer a pedagogical purpose to explain why Turbiak moved M.D.'s chair in a manner that caused the child to fall. They argue it was an accident. Therefore, in order to set forth a substantive due process claim, this incident must be analyzed under the malicious and sadistic standard as laid out in *Lillard*.

Here, it is factually undisputed that Turbiak accidentally caused M.D. to fall. Sokol testified that she thought Turbiak unintentionally caused M.D. to fall because Turbiak was talking to classroom visitors while moving the chair back. (Dkt. 244-10 at 22.) Turbiak explained that she moved the chair back so M.D. would have space to write on the whiteboard the chairs were circled around, but did not anticipate M.D. would back up and sit down without looking behind her. (Dkt. 244-8 at 14.) Plaintiffs fail to rebut either characterization of events with any evidence in the record. (*See* Dkt. 252 at 112.) The Court understands that plaintiffs are at a disadvantage because the children were so young and were cognitively impaired as well. But plaintiffs could have retained an expert and provided a proper report to challenge these facts. Because

they did not, the plaintiffs did not raise a question of fact as to whether Turbiak's conduct was malicious and sadistic.

Plaintiffs counter that an inappropriate comment Turbiak made regarding M.D., that she said she had a "sick sense of humor" when M.D. fell (Dkt. 252 at 43), shows this was intentional conduct. However, this comment does not help explain Turbiak's conduct in question, moving the chair. Instead, it explains her reaction to the fall. As difficult as it is to comprehend Turbiak's response, this comment does not show that Turbiak intentionally moved the chair.

Even so, plaintiffs could not show Turbiak's conduct was malicious and sadistic such that it amounts to a brutal and inhumane abuse of official power that is shocking to the conscience. A teacher slapping a student did not shock the conscious in *Lillard*. 76 F.3d at 726. Nor did a teacher grabbing a special education student by the arm and head and shaking the student hard enough to cause bruising. *Minnis ex rel. Doe v. Sumner Cty. Bd. of Educ.*, 804 F. Supp. 2d 641, 652 (M.D. Tenn. 2011), *aff'd* 501 F. App'x 537 (6th Cir. 2012); *see also Gohl*, 134 F. Supp. 3d at 1084 (cataloguing severe instances of force with students with disabilities that did not shock the conscience). Moving a chair out from under a

student, even a student with disabilities, is not comparable to slapping and shaking a student.

### iii. Liability of Other Defendants

All other defendants are also entitled to summary judgment on all substantive due process claims for three reasons. First, as set forth above, plaintiffs have not alleged an individual theory of liability except deliberate indifference, which plaintiffs fail to show applies in this case as a matter of law. Second, plaintiffs allege no theory of liability that would make nonsupervisory defendants Crews, DeBeaudry, Santer, Sloboda, Sokol, and Sprow, liable for any of Turbiak's alleged substantive due process violations. Plaintiffs may have abandoned these claims because plaintiffs only address the supervisory defendants in their response (Dkt. 252 at 92-95) and supplemental memorandum. (Dkt. 276 at 3-8.) Finally, as addressed below, plaintiffs cannot show supervisory or municipal liability attaches for Turbiak's conduct.

As a matter of law, the individual supervisors and LPS cannot be liable. Supervisors cannot be liable where there is no underlying constitutional violation. *Leary v. Caeschner*, 349 F.3d 888, 903 (6th Cir. 2003) ("A supervisor must "encourage[ ] the specific incident of

misconduct or in some other way directly participated in, or at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate" (quotation marks omitted) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir 1984))); *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). Municipalities also cannot be liable for employee conduct if there was no underlying constitutional violation. *Gohl*, 836 F.3d at 685 ("No one is liable for a constitutional violation that never occurred."). Municipalities are liable under § 1983 for employees' constitutional violations "only where the municipality's policy or custom led to the violation." *Robertson*, 753 F.3d at 622 (citing *Monell v. Dept. of Soc. Servs. of N.Y.*, 436 U.S. 658, 694-95 (1978)). If no constitutional violation occurred, it is unnecessary to look at a municipality's policies or customs. *See Gohl*, 836 F.3d at 685 (citing *Graves v. Mahoning Cty.*, 821 F.3d 772, 776 (6th Cir. 2016)). Because no defendant violated K.H. or M.D.'s constitutional rights, supervisory defendants Chomicz, DeMan, Donagrandi, Fenchel, Liepa, and Moore, and the municipality, LPS, cannot be liable as a matter of law.

## 2. Fourteenth Amendment: Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires "States (and their subdivisions) to treat people alike." *Gohl*, 836 F.3d at 684 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); U.S. Const. amend. XIV, § 1). "The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). People with disabilities are not a suspect class. *See Tennessee v. Lane*, 541 U.S. 509, 522 (2004). Rather, "classifications based on disability violate [the Equal Protection Clause] if they lack a rational relationship to a legitimate governmental purpose." *Id.* (citing *Bd. of Trs. Of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001)). The plaintiffs "possess[ ] the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1360 (6th Cir. 1996) (citing *Gillard v. Norris*, 857 F.2d 1095, 1101 (6th Cir. 1988)). Put another way, plaintiffs must show they were treated "differently—because [they are] disabled—than similarly situated

students who were like [them] in all relevant respects." *S.S.*, 532 F.3d at 458. *See also Gohl*, 836 F.3d at 684.

Plaintiffs allege discrimination based on their disability, but have not met their burden to affirmatively show they were treated differently by defendants from nondisabled students. It is undisputed that Turbiak had no contact with nondisabled students. (Dkt. 252 at 119-20.) Plaintiffs argue that because there is no evidence of abuse by Turbiak against nondisabled students, it shows Turbiak targeted students with disabilities. (*Id.*) But this essentially alleges Turbiak discriminated by way of occupying her post as the MoCI pre-school teacher. This is insufficient. Plaintiffs must show that Turbiak treated nondisabled students differently from students with disabilities. *Gohl*, 836 F.3d at 684.

Plaintiffs alternatively argue that Turbiak treated the lower-functioning students differently than the higher-functioning students in her classroom (*e.g.*, Dkt. 252 at 49, 150), but ultimately do not make an adequate showing to raise a material question of fact regarding this assertion. The record is devoid of any evidence establishing that K.H. and M.D. were lower-functioning students or that other higher-functioning

students were treated better. Viewing the evidence in the light most favorable to plaintiffs, no reasonable juror could conclude that Turbiak treated K.H. or M.D. differently than a nondisabled or higher-functioning student. This is a claim that ultimately does not fit the alleged harm Turbiak inflicted on K.H. and M.D.

All other defendants are also entitled to summary judgment because plaintiffs cannot show a constitutional injury under the Equal Protection Clause. *Leary*, 349 F.3d at 903; *Robertson*, 753 F.3d at 622. Plaintiffs allege no theory of liability that would make nonsupervisory defendants Crews, DeBeaudry, Santer, Sloboda, Sokol, and Sprow individually liable for an Equal Protection violation by Turbiak. Moreover, similar to their substantive due process claims, plaintiffs may have abandoned equal protection claims against these defendants. (Dkt. 252 at 122.) Individual supervisors Chomicz, DeMan, Donagrandi, Fenchel, Liepa, Moore, and LPS, a municipality, again cannot be liable here because there is no underlying Equal Protection violation.

Plaintiffs argue that to establish supervisory liability, they do not need to show an underlying constitutional violation because "supervisory municipal employees may be held liable under the Fourteenth

Amendment for deliberate indifference to the discriminatory conduct of third parties" (Dkt. 252 at 122, 126), but this is a misstatement of law. Plaintiffs attempt to advance an individual theory of liability by pointing to *Shively v. Green Local School District Board of Education*, which sets out a theory of individual liability based upon deliberate indifference in the Equal Protection context. 579 F. App'x 348, 356-57 (6th Cir. 2014).

However, plaintiffs also fail to establish individual liability under *Shively* for defendants who happen to be supervisors. To argue there is an Equal Protection violation as a result of deliberate indifference in a peer-harassment context, plaintiffs must show that defendants' had a discriminatory intent and that their conduct was "a 'clearly unreasonable response in light of the known circumstances.'" *Id.* at 357 (quoting *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)). Discriminatory intent can be established by showing there was a failure to enforce a school policy that was normally enforced. *Id.* at 357 ("departures from established practices may evince discriminatory intent" (quoting *Nabonzy v. Podlesny*, 92 F.3d 446, 455 (7th Cir. 1996)).

Plaintiffs offer no evidence that would permit a reasonable juror to find defendants acted with discriminatory intent and deliberate

indifference by not removing Turbiak from the classroom. Regarding intent, they do not make a showing that defendants departed from the policy regarding "Suspected Student Abuse and Neglect." Rather than comparing the defendants' response in this case to another situation at LPS, such as known abuse against nondisabled students, or even to the facts of *Shively*, plaintiffs simply assert that defendants "knew" Turbiak was abusing students and failed to enforce the policy against Turbiak. (*Id.* at 124.) Plaintiffs need to show that at the point in time when defendants had notice of abuse, they failed to enforce the policy as they did in other instances. Plaintiffs make no such showing.

Plaintiffs also do not make a showing that defendants' response to the situation was clearly unreasonable. Plaintiffs assert that defendants" "response to repeated complaints . . . was clearly unreasonable" and that defendants did not take "any appropriate measures" when they did not remove Turbiak from the classroom. (Dkt. 252 at 124-26.) However, plaintiffs do not make a showing to support this assertion. None of the staff complaining about Turbiak classified her behavior as "abusive" when they reported Turbiak, and the defendants did take action. They catalogued staff complaints, met with Turbiak to assess the situation in

the classroom, referred Turbiak to meet with more senior supervisors; and sent Turbiak a warning letter for unprofessional behavior. Furthermore, LPS later let Turbiak resign, fired Respondek, suspended DeMan, and issued a litany of disciplinary letters. Plaintiffs fail to show how these actions were clearly unreasonable given the circumstances.

### D. Americans with Disabilities Act and Rehabilitation Act Claims against LPS

The ADA and the RA prohibit discrimination against individuals with disabilities. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such a disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA provides that a qualified individual with a disability shall not "solely by reason of her or his disability, be excluded from the participation in, be denied in the benefits of, or be subjected to discrimination any under program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The ADA and RA "allow[ ] disabled individuals to sue certain entities, like school districts, that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their

disability." *Gohl*, 836 F.3d at 681 (citing *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015)).

Claims brought under Title II of the ADA and § 504 of the RA are typically analyzed together because they "require proof of substantially similar elements." *Gohl*, 134 F. Supp. 3d at 1074 (citing *S.S.*, 532 F.3d at 452-53). Title II of the ADA requires a plaintiff to show that "(1)[plaintiff] has a disability; (2) [plaintiff] is otherwise qualified; and (3) [plaintiff] was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of his disability." *Anderson*, 798 F.3d at 357 (citing *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008)). Section 504 requires a plaintiff show:

> (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013) (citing *Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 165 (6th Cir. 2003)).

As in *Gohl*, plaintiffs' ADA and RA claims fail because they do not provide sufficient evidence for a reasonable juror to find they were denied participation in or a benefit of their education program, and plaintiffs have failed to show that any denial was caused by their disabilities.

### 1. Denial of Educational Benefit

Like the plaintiff in *Gohl*, plaintiffs here "[have] plenty of evidence that Turbiak was a bad, perhaps even abusive, teacher when it came to other students." 836 F.3d at 681. However, plaintiffs have not pointed to the record or produced any admissible evidence indicating that they were denied any educational benefit.

Plaintiffs present only Hall's expert report to show they were denied an education benefit.[7] As set forth above, Hall's expert report is broad, conclusory, and lacks any individualized findings regarding plaintiffs' educational plans or their educational progress (Dkt. 252-32), which Hall acknowledged. (Dkt. 244-41 at 3-4.) It is not enough for the purposes of avoiding summary judgment for plaintiffs to make unsupported assertions. For example, plaintiffs state: "Dr. Hall *does*,

---

[7] Plaintiffs submitted a second previously undisclosed report by Hall (Dkt. 252-33), but the Court will not consider it because it granted defendants' motion to strike the report. (Dkt. 267.)

through a very comprehensive analysis of . . . Turbiak's education techniques and treatment of Plaintiffs, establish that Plaintiffs were denied 'a free, appropriate, public education as envisioned in the IDEA, and Section 504 of the Rehabilitation Act[.]'" (Dkt. 252 at 76 (alterations in original).) But plaintiffs provide no authority that permits them merely to point to "a teacher's abusive classroom conduct," unaccompanied by "a showing of actual education deprivation" to make out a claim under the ADA and RA. *Gohl*, 134 F. Supp. 3d at 1079.

Plaintiffs argue that Hall's conclusion that "[t]here is no reasonable basis to believe that any of the students in Sharon Turbiak's classroom . . . were receiving a free, appropriate, public education (FAPE)" is sufficient to raise a material question of fact as to this issue. (Dkt. 252-32 at 5-6.) As in *Gohl*, pointing to Hall's generalized conclusions and calling her findings "uncontroverted" (*e.g.*, Dkt. 252 at 78) is not an affirmative showing that puts the denial of an educational benefit in question or disputes the progress LPS shows plaintiffs made. *See* 836 F.3d at 681-82. There is no triable issue of fact because Hall's report is not an affirmative showing as it does not identify how K.H., M.D., and C.W. were denied any benefit or program by LPS.

49

## 2. Causation

Even if plaintiffs could show that they were denied an educational benefit, they cannot show that their disabilities were the cause of such a denial. To establish a prima facie case, the ADA and RA "require the challenged discrimination to occur *because of* disability, which is another way of saying that the plaintiff must establish a but-for relationship between the protested act and the individual's disability." *Gohl*, 836 F.3d at 682 (citing *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, ___U.S.___, 133 S. Ct. 2517, 2527-28; *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314-15 (6th Cir. 2012) (en banc)). Under the ADA, plaintiffs must "present evidence that animus against the protected group was a significant factor." *Anderson*, 798 at 357 (citing *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006). The RA requires plaintiffs to show animus was the sole cause of the denial of the benefit. *G.C.*, 711 F.3d at 635.

To show causation, plaintiffs may point to direct or indirect evidence of animus. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). Direct evidence does not require the fact-finder to make an inference of discrimination. *Martinez v. Cracker Barrel Old Country*

*Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013). Indirect evidence requires an inference to conclude there was discrimination, and then a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework. *Gohl*, 836 F.3d at 682 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). A showing of indirect evidence of causation under the ADA and RA is usually accomplished by pointing to a comparator, who is a "similarly situated non-protected student[ ]" who was "treated more favorably." *Id.* at 683 (citing *Shah v. Gen. Elec. Co.*, 816 F.2d 264, 268 (6th Cir. 1987)). Here, plaintiffs fail to present direct or indirect evidence of causation.

Plaintiffs generally point to LPS's inaction, despite its alleged knowledge of Turbiak's behavior in the MoCI classroom, but this is insufficient.[8] (Dkt. 252 at 83-84.) This is not direct evidence—nothing in the record points to LPS or its officials failing to act because of plaintiffs' disabilities. This is also not indirect evidence. Plaintiffs ignore the necessary burden-shifting framework to determine what evidence permits an inference of discrimination—the existence of a comparator,

---

[8] Any showing by plaintiffs to the Schultz reports will not be considered because the reports were excluded as double hearsay. (Dkt. 277 at 29:3-4.)

whether a nondisabled or higher-functioning student. Plaintiffs do not offer any evidence that a nondisabled student or a higher-functioning student was treated any differently from plaintiffs. (*See* Dkt. 252 at 78-85.) As in *Gohl*, the analysis stops here because even viewing the evidence in the light most favorable to plaintiffs, they do not point to any evidence to satisfy the first stage of the burden-shifting framework. *Id.* at 683.

### E. State Law Claims

A district court may exercise its discretion to dismiss remaining state law claims when the federal claims are disposed of, as they are in this case. *Brown v. Cuyahoga Cty.*, 517 F. App'x 431, 436 (6th Cir.2013). Plaintiffs' Michigan state law claims, including failure to report child abuse, assault, battery, and intentional infliction of emotional distress, are dismissed without prejudice.

### F. Punitive Damages

Defendants argue that plaintiffs never addressed their arguments against punitive damages, but the question of punitive damages is now moot because the federal claims are dismissed and this Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## IV. Conclusion

For the aforementioned reasons, defendants' joint motion to dismiss and in the alternative for summary judgment is granted, in part, and denied, in part. It is hereby ordered that:

Defendants' motion for summary judgment on plaintiffs' § 1983 claims (counts I to XVII of those remaining) is GRANTED.

Defendants' motion for summary judgment on plaintiffs' ADA and RA claims against LPS (counts XXXIV and L) is GRANTED.

Defendants' motion for summary judgment on plaintiffs' claims under Michigan law (counts LIV to LXXXIV of those remaining) is DENIED, and these claims are DISMISSED without prejudice.

IT IS SO ORDERED.

Dated: October 12, 2018       s/Judith E. Levy
     Ann Arbor, Michigan      JUDITH E. LEVY
                              United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 12, 2018.

s/Shawna Burns
SHAWNA BURNS
Case Manager